**Clyde PADGETT, Plaintiff,**

v.

**LITTON SYSTEMS, INC., Defendant.**

**Civ. A. No. S84–0637(R).**

United States District Court,
S.D. Mississippi, S.D.

June 2, 1987.

William M. Kulick, Biloxi, Miss., for plaintiff.

Karl Wiesenburg, Weisenburg & Reed, William F. Jordan, Litton Systems, Inc., Pascagoula, Miss., for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

This action is before the Court on the complaint of the plaintiff, Clyde Padgett, against Litton Systems, Inc., (Litton) alleging racial discrimination in employment, specifically, his discharge by the defendant, Litton. Jurisdiction is invoked pursuant to 28 U.S.C. Section 1343 for a cause of action arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, *et seq.*

Based upon the record in this case, including the testimony of all witnesses and exhibits introduced into evidence, this Court makes the following findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I. Findings of Fact

This civil action is brought by the plaintiff, a black male and resident of Moss Point, Mississippi. Defendant Litton is a Delaware corporation, authorized to do business within the State of Mississippi, and has employed twenty-five or more persons for each working day in each period of twenty or more calendar weeks during the preceding year.

The plaintiff, forty-four years old at the time of trial, began work with Litton in 1976 as a security officer. The occupational summary appearing on Defendant's "position description" papers describes the holder of this position as one who "performs those security duties which are essential to employee and plant protection." A Plant Protection Manual applicable to Litton's shipbuilding operations is furnished to the security force and contains copies of specific orders pertinent to the security officers' respective posts. Plaintiff's statement and signature to the effect that he had read and understood the manual is dated March 10, 1983. Among the special orders for officers assigned to the hull patrol of CG47 class ships are these:

1. Patrols assigned hull and punches all Detex keys.
2. Notifies Guard Headquarters and Ship's Management of any hazardous conditions.
3. Reports any unusual conditions immediately to the Shift Commander.
4. Check all closed areas to ensure they are secure. (For Secret closed areas, see supplemental orders for Hull Patrol.)

    *     *     *     *     *     *

7. Check all special areas to ensure they have been properly secured. (A list of these areas will be provided and maintained current by the Program Office). Make a Security report of those areas not secured.
8. Note and report to the Shift Commander for referral to the Fire Department, fire hazards and empty or unsealed fire extinguishers.

As enumerated above, one of the officers' specific responsibilities is to punch all Detex keys on a designated clock route. A bulletin posted March 26, 1984, by W.M. Caulfield, Manager of Defendant's Plant

Protection and Government Security, and R.L. Harry, Commander of Security, describes the Detex system thusly:

> The Detex System is based on a clock in which a dial is inserted and locked in place, and Detex keys with different numbers. A Security Officer carries the clock, in a leather case with a shoulder strap, on his patrol route. At critical points on his assigned route, there are keys located affixed to walls, etc., with a chain. Each time he comes to a key, he inserts it in a slot on the side of the clock and turns it. The key at that point makes a numbered impression on the dial in the clock. The dial is set to rotate within the clock as the time advances, so the numbered impression is made on the dial in a position that reflects the current time. At the end of the shift, or for whatever period the patrol is scheduled, the clock is opened and the dials marked with the patrols' names and turned over to supervision for screening. Periodically on spot check basis, the dials are checked in detail to ensure the system is functioning. These dials are contractually required records and are safeguarded until checked by government authorities and then for an additional period to satisfy insurance requirements.
>
> Any keys on the route that are not punched must be made the subject of a security report by the officer concerned, advising the reason why the key was not punched.

At trial copies of reports filed by officers who were unable to punch keys for various reasons (e.g., power failure, radiation levels, radar testing, etc.) were admitted into evidence by stipulation; samples of such reports signed by the plaintiff are dated April 19, 1983, and September 6, 1983.

Defendant's stated policy concerning the taking of any necessary disciplinary action against its employees states in pertinent part:

Each supervisor is responsible for the disciplining of their assigned personnel. The primary purpose of discipline is correction rather than punishment. Prompt correction action is taken in all cases and consists of a written warning, disciplinary layoff, or immediate discharge, as the facts of the situation require.

\*　　\*　　\*　　\*　　\*　　\*

Prior to taking disciplinary action, supervisors shall obtain all available information on the circumstances from which the situation arose. If the information warrants corrective action, disciplinary action as outlined below shall be taken. Minor problems should be handled promptly to prevent occurrence of serious incidents or disciplinary problems.

\*　　\*　　\*　　\*　　\*　　\*

Employees may be discharged when guilty of a repeat offense within 120 days of a three-day disciplinary layoff, or where the seriousness of the offense requires immediate and permanent termination of the employee. In the case of discharge, the supervisor shall clear the action with his department head and Labor Relations before the employee is cleared out of the yard.[1]

Defendant's Company Manual of Rules and Regulations provides in pertinent part:

## VIII. FALSIFICATION OF RECORDS

Any employee found misrepresenting or falsifying any application, certification or any other company document will be subject to immediate discharge.

Sometime in the early fall of 1983 it came [2] to the attention of Commander Harry and Chief Caulfield that some security officers assigned to the CG49 hull patrol were punching keys at Detex stations located on the dock in substitution for punching Detex keys at stations aboard the ship. Since certain Detex keys located on land produced identical physical imprints as those located on the ship, an officer could

---

1. Defendant's Exhibit No. D-8.

2. Commander Harry, who is black, testified that a white security officer, Lloyd Diamond, informed him of the infraction. Major W.E. Price, who is white, testified that he learned of the infraction from Donny Ray Cox, a white security officer.

punch only the former and thereby create the impression that he had performed his scheduled round as required and punched the proper keys.[3] Deciding that this circumstance could not be tolerated, keys located on the ship were changed on Friday, September 7, 1983, and clock dials representing all shifts for that weekend were monitored thereafter by Major Price and Commander Harry. It was determined that two officers, Plaintiff and Henry A. Johnson, both black and both on the second shift, were guilty of not boarding the ship, punching the proper keys located thereon and punching the keys on the dock as an attempted substitution. On September 17, 1983, an employee meeting was called in which Chief Caulfield, Commander Harry, Major Price, and a Mr. Hudson from Defendant's Labor Relations Department were in attendance. Plaintiff was apprised of the evidence against him which indicated his violation of Defendant's company rules and dereliction of duty. Plaintiff admitted his misconduct both at the meeting and at trial. He was immediately discharged, with the stated reason for his termination listed in his personnel file as having "failed to perform duties as prescribed." A similar fate befell Mr. Johnson.

Plaintiff's complaint is capsuled in his EEOC charge and the pretrial order as follows:

I was hired on October 21, 1976, as a security guard. I was discharged on October 18, 1983.

William Price, white supervisor, told me I was being discharged for failure to punch detex keys at a certain location. I believe I have been discriminated against because of my black race inasmuch as:

A. In the past other security officers, mostly white, have also committed the same violation and they were not fired.
B. The night I failed to punch detex keys, another employee, Henry Johnson (a black male) failed to punch detex keys. He was given a warning.

However, when I asked to see the records used to fire me, Johnson was also fired.

The plaintiff's charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC) on January 5, 1984. The EEOC on May 4, 1984, rendered a "no cause" determination stating, "Examination of the evidence in the record indicates that there is not reasonable cause to believe that this allegation (racial discrimination) is true." Simultaneously with its "no cause" determination, the EEOC issued a "right to sue" letter to the plaintiff. Plaintiff filed this civil action within the time required by the applicable provisions of Title VII.

## II. Conclusions of Law

A plaintiff alleging disparate treatment in a Title VII action has the initial and ultimate burden of proving discriminatory intent. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This case having been fully tried on its merits, the Court need not resort to the shifting burden of proof analysis utilized by the Supreme Court in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In other words, since the defendant has responded to the plaintiff's proof by offering evidence in support of its reason for having discharged the plaintiff, the appropriate factual inquiry is properly focused on whether plaintiff's termination was the result of unlawful discrimination within the meaning of Title VII. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Lopez v. Current Director of Texas Economic Development*, 807 F.2d 430 (5th Cir.1987). With respect to discharge for violation of work rules, the plaintiff must demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly. *Green v. Armstrong Rubber Co.*, 612 F.2d

---

**3.** During the trial of this cause this practice was repeatedly, albeit ineptly, referred to by counsel as the use of confederate keys.

967 (5th Cir.1980). The Court must make the ultimate determination of whether the plaintiff has succeeded in persuading the trier of fact that a discriminatory reason more likely motivated the Defendant or that the Defendant's proffered explanation for the termination is not worthy of credence. *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394, 400 (5th Cir.1986).

Discriminatory intent can be proved either by direct evidence or by circumstantial evidence. *Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1045 (5th Cir.1984). In adjudging the facts presented to the Court during the trial of this cause, the Court is mindful of the following language in *Barnes v. Yellow Freight Systems, Inc.*, 778 F.2d 1096, 1101 (5th Cir.1985):

> When a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are essentially identical, a presumption of discriminatory intent is raised. This presumption arises because we assume that an employer acts on the basis of some underlying reason, either legitimate or not. Consequently, if there is no apparently legitimate reason for a white supervisor's alleged disparate treatment of a black employee, it is more likely than not that the supervisor based the decision on an impermissible consideration such as race. (citation omitted).

Thus, a court faced with a disparate treatment Title VII case such as this one must often look behind and beyond an employer's words and ask probing questions about the practices of the workplace, seeking out and attempting to resolve any inconsistencies in the manner of dealing with the employee in question.

At trial Plaintiff testified he had been told by a white security officer, H.L. Roberts, that the Detex keys on the dock were the same as the Detex keys on the ship. Roberts also reportedly told Plaintiff that "everyone" on the day shift was in the practice of punching the keys on the dock in place of those on the ship. Because of this, Plaintiff explained that he felt less culpable for his misconduct. Roberts did not testify.

Plaintiff also testified that other white security officers were guilty of the same shenanigan, but with virtual impunity, among them Billy C. Williamson, Donny Ray Cox and an officer named Jackson, who is now deceased. Plaintiff also pointed to certain instances which in his opinion served to demonstrate Defendant's partiality and favoritism towards whites. These included (1) "punishing" the entire security force by requiring the officers to complete their rounds in one hour instead of two when it was discovered that a white security officer named Vrisage, who did not testify, had missed keys, (2) discharging but then re-hiring a white security officer named Webber, who also did not testify, when he was allegedly caught stealing something from the maintenance department and (3) assigning "light" assignments (e.g., administration building duty) to white security officers Massey, who did not testify, and Harper.

During the course of this testimony Plaintiff attempted to explain and justify why he purposefully avoided boarding the ship and punching the required keys. Plaintiff stated that conditions on the ship were dangerous (i.e., poor lighting, slippery surfaces, sharp objects) and, moreover, in his opinion the safety and security of the ship could be ensured just as easily from the dock as it could aboard the vessel.

Finally, and most tellingly, Plaintiff testified as to what he thought was the real motivating factor which led to his discharge. Plaintiff cited (1) the differing political views espoused by himself and Major Price, (2) the fact that Plaintiff's outspoken opinions and job suggestions were always harshly rejected by management personnel within the security department, and (3) Commander Harry's alleged suspicion of Plaintiff having an affair with Harry's mistress. At trial Price denied "setting a trap" to "catch" the Plaintiff on account of their divergent political views and Harry denied recommending Plaintiff's dismissal on account of an alleged affair.

After having weighed and considered the cumulative worth of Plaintiff's grievances and allegations, the Court determines the Plaintiff has not proven by a preponderance of the evidence that his discharge was the product of unlawful discrimination within the meaning of Title VII. Each of the three white security officers currently employed with Defendant who testified—Williamson, Cox and Harper [4]—denied they had ever punched Detex keys at one location in an effort to make their supervisors believe they had in fact punched keys at another required station on their route. Although the Court finds their testimony credible, this is not to say, as former white security George W. Dyche indicated in his testimony, the Court does not find it possible for white security officers to have also been guilty of this practice. Plaintiff, however, failed to both substantiate this allegation with credible evidence and, even if it were so substantiated, prove that they received racially motivated, disparate punishment. The assortment of rule violations attributable to other security officers, both black and white, on which Plaintiff adduced evidence differed vastly from the violation for which Plaintiff was discharged, but they were met with punishment commensurate with the infraction. For example, in 1978 Cox missed punching four to six keys on one of his rounds due to his preoccupation with a domestic problem. Cox immediately reported his negligent omission to the shift captain, and then filed a written report with Chief Caulfield. Cox was suspended from duty for three days without pay and was told that if he failed to punch keys again he would be fired.

The Court finds significant Plaintiff's failure to demonstrate racially selective monitoring of the clock dials on the part of Defendant for the weekend of September 10, 1983. Defendant's security force,[5] which is comprised overall of approximately thirty guards, had a 60%—40% white to black racial makeup at the time Plaintiff was discharged. The racial ratio of the security officers who worked the shifts for the weekend in which the dials were monitored was also 60%—40%.

In adjudging whether Plaintiff's discharge was more likely than not based on an impermissible consideration such as race, the Court not only is concerned with the employer's alleged favorable treatment but also with the legitimacy of Defendant's stated reason for the termination. The importance of adequate security protection for Defendant's shipbuilding operations is obvious both from the standpoint of national security interests and the effective conduct of Defendant's business. Besides being an obligatory duty as stated in Defendant's contract with the government, requiring security officers to board vessels under construction and punch Detex keys while conducting their rounds thereon has several valid objectives, i.e., protection against the disclosure of classified information, surveillance for fire, theft, or other mishap, etc. Plaintiff conceded at trial that he made no complaint to the Defendant regarding hazardous conditions [6] aboard the vessel on either September 10, 1983, or at the employee meeting held on September 17, 1983. Understandably, Chief Caulfield took the position that, although safety was of paramount importance, a decision not to board a ship because of unreported, allegedly hazardous conditions was not within the individual security officer's discretion anyway.

Chief Caulfield testified that security officers were hired for two main reasons, namely their physical presence and their integrity. It is not the function of this Court in the case *sub judice* to pass judgment upon the prudence or efficacy [7] of

---

**4.** Harper denied being "friendly" with officials in the administrative building.

**5.** Chief Caulfield testified that three of the six top positions within the security force were held by blacks.

**6.** The Court notes Johnson's testimony to the effect that lighting aboard the ship was generally satisfactory.

**7.** The Court here is referring to "above average" performance appraisals contained in Plaintiff's personnel file as well as testimony from Plaintiff's former co-workers.

Defendant's disciplinary action against the Plaintiff, only whether his discharge was the result of intentional discrimination and therefore unlawful. The intentional, deceptive nature of Plaintiff's misconduct, which was tantamount to falsification of records, eroded the perception of trustworthiness Chief Caulfield sought to preserve for the officers on Defendant's security force. The Court concludes that Plaintiff's discharge was the result of Defendant's effort to further a legitimate, nondiscriminatory business objective, and that such was not a pretext for racial discrimination. Accordingly, the Court is of the opinion that the Plaintiff has failed to sustain his burden of proof that he was discriminantly discharged because of his race.

Counsel for Defendant is instructed to furnish the Court with a Judgment consistent with the Court's above findings within ten (10) days from the date hereof.